**MARK B. FROST & ASSOCIATES**
**BY: MARK B. FROST**
**BY: RYAN M. LOCKMAN**
**1515 Market St., Suite 1300,**
**Philadelphia, PA 19102**
**P: 215-351-3333**
**F: 215-351-3332**
**Attorneys for Plaintiff**

## UNITED STATES DISTRICT COURT
## DISTRICT COURT OF NEW JERSEY

| | |
|---|---|
| **SHARON OTERO,** | **: CIVIL ACTION** |
| | **: NO.** |
| **v.** | **:** |
| **PORT AUTHORITY OF NEW JERSEY** | **:** |
| **MICHAEL FEDORKO,** | **:** |
| **Individual and official capacities,** | **:** |
| | **: COMPLAINT** |
| **Defendants.** | **:** |
| | **: JURY TRIAL DEMANDED** |

### NATURE OF ACTION

1. This action arises from the deprivation of rights secured to the Plaintiff Otero pursuant to the Americans with Disabilities Act.

2. This cause of action was previously filed under the consolidated case Otero v. Port Authority, 14-1655, but was severed pursuant to the March 27, 2019 Court Order of the Honorable Esther Salas, U.S.D.J.. Said Order is attached hereto as **Exhibit A**.

### JURISDICTION AND VENUE

3. This action is brought pursuant to the Americans with Disabilities Act. Jurisdiction is founded on 28 U.S.C. §§ 1331 and 1343.

4. Jurisdiction lies over the state law claims based on the principles of supplemental jurisdiction, as codified at 28 U.S.C. § 1367.

5. The amount in controversy, exclusive of interest and costs, exceeds the sum of one hundred thousand dollars ($100,000.00).

6.   As set forth herein, the unlawful employment practices complained of herein occurred, and Defendant regularly does business within the District of New Jersey, and Defendants reside within the District of New Jersey. Therefore venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1392 and 42 U.S.C. § 2000e-5(f)(3).

## PARTIES

7.   Plaintiff Sharon Otero is a citizen of the State of New York, residing therein at 63-04 62nd Avenue, Middle Village, NY, 11379. At all times material, Plaintiff has been employed as a police officer in the Port Authority Police Department.

8.   Defendant, Port Authority of New York and New Jersey (cited variously herein as "Defendant" or the "Port Authority") is a bi-state transportation agency created with the consent of the United States Congress pursuant to Article 1, §10 of the United States Constitution.

9.   At all relevant times, the Port Authority was and is a state actor, has employed over 1,000 police officers, and has been continuously, and is now, doing business in the States of New York and New Jersey.

10.   The Port Authority's main office is located at 225 Park Avenue South, New York, NY 10003. The Port Authority maintains offices in and regularly transacts business in New York and New Jersey.

11.   The Port Authority is a municipal corporate instrumentality under the laws of New York and New Jersey.

12.   The Port Authority's power derives from the consent of Congress and from the States of New York and New Jersey, the latter two of which appoint the twelve commissioners that govern the Port Authority - six are selected by each of the participating states. The Commissioners' actions are, in turn, subject to veto by the governor of either state.

13.     Further, in the event the Port Authority's revenues are inadequate to meet its expenses, each state is obligated only to pay for the Port Authority's salaries, office and administrative expenses.

14.      Defendant Port Authority controls the Port Authority Police Department.

15.    The Port Authority Police Department headquarters is located at 241 Erie Street, Jersey City, NJ 07310.

16.    Defendant Michael Fedorko has at all times material served as Superintendent of the Port Authority Police Department, located at 241 Erie Street, Jersey City, NJ 07310. In such a capacity, Fedorko is a policymaker for the Port Authority and/or Port Authority Police Department.

17.     Defendants John Does #1-10 are employees and/or officials of the Port Authority and/or PAPD who were involved in the implementation of the promotional examination for the rank of Sergeant and/or who manipulated portions of said examination for improper purposes. The identities of these individuals are not currently known to Plaintiffs.

## **FACTUAL ALLEGATIONS**

### **A.  PORT AUTHORITY POLICE FORCE**

18. The Port Authority maintains a Police Force to protect all facilities owned by the Port Authority, to maintain order, and to enforce state and city laws at these facilities.

19. Port Authority police officers are designated by statute as police officers of both New York and New Jersey.

20. Port Authority police officers have law enforcement jurisdiction in New York and New Jersey and are permitted to serve warrants, make arrests, use physical and deadly force, carry and use firearms, carry and use handcuffs, issue summonses, engage in criminal investigations, employ counterterrorism strategies, and participate in aircraft rescue, firefighting, and emergency services.

21. Port Authority police officers begin their careers as uniformed officers.

22. Both uniformed police officers and detectives are supervised directly by police officers who have obtained the rank of "Sergeant" or "Detective Sergeant".

23. The rank of Sergeant is the first official supervisory level in the leadership hierarchy of the Port Authority police department.   There are other supervisory ranks above the rank of Sergeant and the pay scale for each progressively higher rank in the hierarchy is higher than the rank below Sergeants are paid a base salary that is higher than that paid to uniformed officers.

24. A police officer cannot be promoted to higher ranks without first being promoted to Sergeant.

25. The Port Authority Police Department (PAPD) is responsible for law enforcement over approximately thirteen (13) transportation-related facilities under control of the Port Authority of New York and New Jersey.

26. PAPD officers may receive permanent assignments to any of the following locations, which are administered by the Port Authority: the Port Authority Bus Terminal, PATH, the George Washington Bridge, the Staten Island bridges, the Holland Tunnel, the Lincoln Tunnel, JFK International Airport, LaGuardia Airport, Newark Liberty International Airport, Port Newark, and the World Trade Center site.

27. Port Authority Officers also may be assigned to the Port Authority Headquarters, the PAPD Police Academy, or a number of specialized units.

28. Further, PAPD used to maintain an assignment called the Central Police Pool, also referred to as "the Pool"; those officers assigned to the Pool were given various different assignments at various Port Authority facilities on a daily and/or temporary basis. An officer assigned to the pool would often be trained to perform duties in a variety of assignments, locations and commands.

29. At all times material, the PAPD consisted of approximately 1,400-1,700 officers at any given time.

**B.  THE 2010 PORT AUTHORITY SERGEANT PROMOTIONAL PROCESS**

30. On or about March 3, 2010, the PAPD announced that it would be conducting a promotional examination for the rank of Sergeant.

31. The policies set forth therein were not followed, as set forth below. The Port Authority intended to mislead candidates, including the plaintiffs, by issuing promotional announcements, which candidates would believe would be followed and applied in a good faith manner. In reality, as set forth herein, Defendants intended to not follow the promotional policy and to not conduct the promotional process in good faith.

32. At the time of the announcement, officers were informed that all discipline would have to be resolved in order to be promoted.

33. Additionally, officers would not be permitted to partake in the promotional process if said officer had 5 or more sick occasions or 13 or more days lost in the 12 months prior to the March 3, 2010 promotional announcement.

34. Officers also would be required to have three years of in-grade experience at the time of the written examination, and four years of in-grade experience at the time of promotion.

35. The candidates first took a written examination, which occurred on or about April 17, 2010.

36. On December 1, 2010, the Port Authority sent out letters to each applicant containing that particular candidate's own examination score, indicating only the percentage of questions that the candidate correctly answered.

37. Those officers who received a passing score of 70% on the written examination would be placed in a pool of officers called the "Police Sergeant Horizontal Roster" (Hereinafter, "Horizontal Roster").

38. Upon information and belief, 465 officers, including all plaintiffs, passed the written examination and were placed on the horizontal roster.

39. Through the procedure described herein, all officers on the Horizontal Roster would be eligible to be chosen to proceed to the selection and appointment process, which consisted of evaluation by the PAPD's Promotion Review Board and an interview with a rotating three-person panel of members from the Public Safety and Human Resources (HR) Departments.

40. When a vacancy for Sergeant was to be filled, the Office of Inspector General ("IG") would oversee the random selection of officers on the Horizontal Roster to be evaluated, interviewed, and selected for promotion.

41. When the Horizontal Roster was created via the random selection process, the chosen candidates would be evaluated by the Promotion Review Board to determine that they meet the promotional screening criteria.

42. Upon information and belief, 60 officers were purportedly randomly chosen from the horizontal roster by the IG to be evaluated and interviewed.

43. Upon information and belief, the IG did not actually implement and/or consistently implement a random selection process, and candidates were chosen to proceed in the examination process by other means which were not random or objective.

44. The Port Authority intended to mislead candidates, including the plaintiffs, by claiming that the Inspector General would be randomly choosing candidates to proceed.

45. As part of the evaluation and interview process, each candidate would be rated by the Promotion Review Board in seven (7) categories: 1) Breadth of Experience/ Exposure, 2) Police Sergeant Roster Promotional/Developmental Appraisal, 3) Qualifications Review Meeting, 4) Attendance, 5) Discipline, 6) CCIU Complaints, and 7) Investigation.

46. The Qualifications Review Meetings (QRM'S) were conducted by various panels, consisting of three individuals. These three individuals were not the same or consistent over all of the

interviews. Rather, the individuals assigned to the panel for each interview completely varied. For the most part, each panel consisted of 2 members of the Port Authority Human Resources department and one PAPD superior officer. The H.R. members were not well-versed in police policies, procedures, or duties.

47. Further, no benchmarks, guidelines, or uniform scoring systems were used to grade each candidate on each category, nor did each panel apply a uniform scoring system.

48. The panels did not utilize the same and/or similar criteria, and promoted purely in an arbitrary and/or capricious manner. The ratings given to the candidates were influenced by nepotism, cronyism, political affiliations and/or associations, and unfair and/or unlawful practices. Further, the Defendants knew or should have known that certain candidates had been previously provided with the questions and suggested answers for the Qualification Review Meeting.

49. The Port Authority intended to mislead candidates, including the plaintiffs, by conducting QRM's, which candidates would believe would be followed and applied in a good faith manner. In reality, as set forth herein, Defendants intended to not follow the promotional policy and to not conduct the QRM's in good faith.

50. Category number 2, the Police Sergeant Roster Promotional/Developmental Appraisal was a recommendation by each candidate's respective immediate supervisor. In this section, candidates could receive a rating of "Highly Recommended", "Recommended", or "Not recommended."

51. Category number 3, the Qualification Review Meeting, constituted an interview between the candidate and a rotating three-person panel consisting of members of the Public Safety and Human Resources Departments.

52. Of the seven (7) categories listed above, categories 1, 3, 4, 5, 6, and 7 were rated on the following scale: Needs Development/Unacceptable, Fully Competent/Acceptable, and Outstanding.

53. Of the seven (7) categories listed above, category 2 was rated on the following scale: Not Recommended, Recommended, and Highly Recommended.

54. Ultimately, based on the above seven (7) categories, each candidate would receive an "Overall Recommendation" by the Promotion Review Board of Not Recommended, Recommended, or Highly Recommended.

55. Promotions would then be made by PAPD Superintendent Michael Fedorko from the list of those officers who were interviewed.

56. No appeal procedure was in place, and the candidates – including plaintiff – were deprived of the opportunity to appeal the results or have a hearing regarding their results if they were dissatisfied with same. No reasons or explanations for the results of each candidates' ratings were provided, and the results themselves were not disclosed to each candidate.

### C.     PAPD'S PATTERN AND PRACTICE OF UNFAIR PROMOTIONAL PROCESSES

57.     The Port Authority Police Department has developed and maintained a pattern and practice whereby the procedure for promotion of police officers to the rank of Sergeant is manipulated to achieve desired promotions.

58.     Despite its promulgation of the policy procedure set forth in the various promotional announcements and postings, upon information and belief, the Port Authority has intentionally and knowingly ignored and violated said policies. The defendants knew that the policies and procedures set forth with regard to promotions to the rank of Sergeant were false, intended to mislead and fraudulent.

59. The Port Authority intended to mislead candidates, including the plaintiff, by issuing promotional announcements, which candidates would believe would be followed and applied in a good faith manner. In reality, as set forth herein, Defendants intended to not follow the promotional policy and to not conduct the promotional process in good faith.

60. The Port Authority had no rational basis for adopting, publicizing, and putting the individual Plaintiff through its 2010 procedures for promotion to Sergeant only to thereafter arbitrarily, capriciously and unlawfully disregard its procedures, or to implement them unfairly.

61. The promotional interviews were conducted by various panels, consisting of three individuals. These three individuals were not the same or consistent over all of the interviews. Rather, the individuals assigned to the panel for each interview completely varied. For the most part, each panel consisted of 2 members of the Port Authority Human Resources department and one PAPD superior officer. The H.R. members were not well- versed in police policies, procedures, or duties.

62. Further, no benchmarks, guidelines, or uniform scoring systems were used to grade each candidate on each category, nor did each panel apply a uniform scoring system. Rather, scoring was conducted in a manner to benefit those with political affiliations and associations, as set forth above.

63. The panels did not utilize the same and/or similar criteria, and promoted purely in an arbitrary and/or capricious manner. The ratings given to the candidates was influenced by nepotism, cronyism, and unfair and/or unlawful practices. Further, the Defendants knew or should have known that certain candidates had been previously provided with the questions and suggested answers for the Qualification Review Meeting.

64. The Port Authority had no rational basis for its decision to avoid and unlawfully change its Sergeant promotional policies and procedures.

65. Rather, the promotional policies were adopted as pretext with the intention to mislead the candidates, including Plaintiffs, into believing that the promotional process would occur in a good faith manner based on merit.

### D.  PLAINTIFF SHARON OTERO

66. Plaintiff Sharon Otero entered the New Your Police Department on or about July 7, 1999 as a police officer. At all times material until September 27, 2002, Plaintiff served as a NYPD police officer.

67. On September 11, 2001 (hereinafter, "9/11"), in the immediate aftermath of the terrorist attacks in Lower Manhattan, Plaintiff served as a first responder on behalf of NYPD. Specifically, on 9/11, Plaintiff was in charge of pedestrian evacuation from Lower Manhattan to Williamsburg, Brooklyn over the Williamsburg Bridge.

68. Further, Plaintiff further worked at the World Trade Center site as part of the recovery, clean-up and security on thirty-seven (37) different dates following 9/11.

69. As a result of being in the vicinity of the World Trade Center on 9/11 and thereafter, Plaintiff developed chronic and/or persistent medical problems, including but not limited to chronic rhinitis (also known as irritant-induced nasal inflammation), chronic sinusitis, nasal and sinus congestion, and postnasal discharge.

70. Additionally, for a temporary period following 9/11 and the subsequent recovery and clean-up effort, Plaintiff suffered eye, throat and skin irritation.

71. As such, Plaintiff has been entered into the WTC Treatment Program and officially registered by the New York Worker's Compensation Board as a 9/11 First Responder who developed upper respiratory and other medical problems from her exposure to hazardous substances during the rescue, recovery and/or clean-up operations following the World Trade Center attack.

72. On or about September 27, 2002, Plaintiff left the NYPD to become a police officer for the Port Authority. At all times material since September 27, 2002, Plaintiff has served as a Port Authority Police Officer.

73. Plaintiff was initially assigned to the pool.

74. On or about October 3, 2004, Plaintiff was transferred to the Holland Tunnel.

75. On or about September 7, 2008, Plaintiff was transferred to LaGuardia Airport.

76. On or about July 12, 2009, Plaintiff was transferred to the World Trade Center. At all times material since July 12, 2009, Plaintiff has been assigned to and has worked at the World Trade Center site.

77. Since becoming employed with PAPD, Plaintiff has completed a number of training course and obtained various certificates related to her duties as PAPD officer.

78. Plaintiff enrolled in the 2010 Sergeant's Promotional Examination.

79. On December 1, 2010, Plaintiff learned that she received a passing score of 83% on the written examination.

80. As such, Plaintiff was eligible to be chosen to proceed to the next examination section.

81. On March 1, 2011, Plaintiff was randomly chosen for the first round of evaluations and interviews.

82. Plaintiff met all of the qualifications and criteria for promotion, pursuant to the March 3, 2010 promotional announcement.

83. Interviews, formally known as Qualification Review Meetings, were conducted from June 25, 2011 to June 27, 2011.

84. Plaintiff's interview panel consisted of Inspector Brian Sullivan, Captain John McClave, and a female from Human Resources.

85. On or about August 10, 2011, the PAPD issued a letter to Plaintiff outlining her results of her interview. Plaintiff received the highest rating, "Outstanding", in four (4) of the seven (7)

categories, as well as "Recommended" in her promotional/developmental appraisal by her immediate supervisor.

86. However, Plaintiff received an "unacceptable" rating for attendance, and a rating of "Needs Development" for her Qualifications Review Meeting.

87. The appraisal attached to the March 3, 2010 promotional announcement was not used for Plaintiff. This March 3, 2010 appraisal form was consistent with the attendance and eligibility standards set out in the March 3, 2010 announcement.

88. Rather, the appraisal form that was used for Plaintiff required Plaintiff to meet the more stringent attendance standards set out in the June 15, 2011 announcement, even though the June 15, 2011 announcement had been cancelled.

89. Because the new attendance standard was used, Plaintiff received an "unacceptable" for attendance in her promotional evaluation.

90. As a result, despite being recommended by her immediate supervisor and receiving a rating of "outstanding" in four categories, Plaintiff was nonetheless given an overall recommendation of "Not recommended" by her interview panel.

91. As PAPD was aware, Plaintiff's sick absences were due to Plaintiff having sustained chronic medical conditions as a result of serving as a first responder on 9/11 and assisting in the clean-up and recovery at WTC in the aftermath of 9/11.

92. As a result of Plaintiff receiving an overall recommendation of "Not Recommended", when 14 promotions were made on or about July 8, 2011, Plaintiff was not chosen for promotion, and was placed back on the horizontal roster.

93. As previously set forth, on November 21, 2012, the PAPD issued another promotional opportunity announcement for those officers remaining on the horizontal roster as of March 1, 2011.

94. On March 1, 2011, Plaintiff was on the Horizontal Roster, and was therefore eligible for promotion.

95. However, as previously set forth, this November 21, 2012 announcement required "initial screening criteria" that was different from the screening criteria in the original promotional announcement.

96. These new initial screening criteria required, inter alia, that the candidate have three or fewer "sick absence occasions" in two of the last three years, and eleven or fewer "sick days" in two of the last three years, which was different from the original promotional requirement.

97. This was a dramatically higher standard than the original criteria – which Plaintiff met – that only disqualified an officer if he or she had 5 or more sick occasions or 13 or more days lost in the 12 months prior to the date of the promotional announcement.

98. As a result of this change, Plaintiff did not meet the new criteria for maximum number of absences.

99. On February 4, 2013, Plaintiff received a letter from the HR Department of the Port Authority stating that, due to her absences, Plaintiff would not be eligible to receive a qualification meeting review or further proceed in the promotional process. As such, she was not eligible for further consideration for promotion.

100.    Plaintiff was eligible initially for promotion. However, because the PAPD changed the promotional criteria with regard to number of sick absences in the middle of the promotional process, Plaintiff was no longer eligible for promotion under the PAPD's new policy.

101.    On or about July 18, 2013, Plaintiff Otero received a memorandum from Gloria Frank, Port Authority's Commanding Officer at the World Trade Center, stating that Plaintiff had incurred too many absences, and that, as a result, Plaintiff would receive sick leave counseling. The absences referenced in Commanding Officer Frank's memorandum were

incurred due to the injuries and conditions that Plaintiff sustained at the World Trade Center on and in the aftermath of 9/11.

102.    Plaintiff has received one or more sick counseling memos, related to her injuries and conditions that Plaintiff sustained at the World Trade Center on and in the aftermath of 9/11.

103.    To date, Plaintiff has not been promoted and has not been permitted to proceed to evaluation and interview since the new disability criteria was implemented.

104.    As a result of individuals being improperly permitted to proceed in the examination process and improperly chosen to be promoted, these individuals filled openings for promotion to Sergeant, which could and should have been offered to Plaintiff. As such, as a result of the improprieties and manipulation described above, Plaintiff was denied the opportunity to be promoted.

105.    Moreover, several officers who did indeed fail all absence and sick criteria, along with other promotional criteria, were allowed to proceed with the promotional exam, recommended for promotion, and promoted.

106.    Due to the improper manipulation of the promotional process by Defendants, as well as a discriminatory actions of defendants, Plaintiff has been deprived of the opportunity to be promoted.

107.    Due to the arbitrary, capricious, and discriminatory actions and policies of the Defendants, Plaintiff has been deprived of a fair, unbiased, and transparent promotional process.

108.    Additionally, Plaintiff Otero filed a charge of discrimination on the basis of disability with the EEOC, based on the aforementioned conduct by Defendants. On January 16, 2015, the EEOC issued a right to sue letter, which Otero's counsel received on January 22, 2015.

109.    Because of Plaintiff's arbitrary and capricious scoring and selection, as well as the PAPD's manipulation and wrongful change to the promotional process, Plaintiff was denied

the opportunity to be promoted to Sergeant and also denied the opportunity to subsequently be promoted to Lieutenant.

**COUNT I**
**PLAINTIFF OTERO V. DEFENDANTS PORT AUTHORITY AND FEDORKO**
**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**

110.     Plaintiffs incorporate by reference the preceding allegations of this Complaint as though each were individually set forth herein at length.

111.     Plaintiff Otero is and has at all times material since September 11, 2001 been disabled and/or handicapped for purposes of the Americans with Disabilities Act (ADA).

112.     Plaintiff Otero is and has all times material been able to perform the essential functions of the positions of Port Authority Police Officer and Sergeant, with or without an accommodation.

113.     Defendant Port Authority, with Fedorko as policymaker, developed and implemented policies that intentionally, knowingly, recklessly and/or negligently discriminated against Plaintiff based on her disability and/or handicap.

114.     As a result of Plaintiff's disability and/or handicap, which was developed as a result of Plaintiff's work-related duties on and after 9/11, Plaintiff has been denied a promotion to Sergeant.

115.     As a direct and proximate result of the actions of Defendants, Plaintiff has suffered and will in the future suffer pain, emotional distress, mental anguish, humiliation, embarrassment, inconvenience, loss of pleasure and enjoyment of life, loss of reputation, lost wages, lost wage earning capacity, loss of benefits, and past and future medical expenses.

WHEREFORE, Plaintiffs respectfully request this Honorable Court:

     a.   Declare the 2010-present Sergeants Examination process to be null and void and a new Sergeants Exam to be announced and taken.

     b.   Declare that all Officers who were promoted to Sergeant pursuant to the tainted

exam be reduced to their former ranks, and/or in the alternative, promoting Plaintiff Otero to Sergeant.

c.  Enter a declaratory judgment that Defendants' acts complained of herein have violated and continue to violate the rights of Plaintiff as secured by the NJLAD;

d.  Award Plaintiff compensatory damages including but not limited to:  pain, suffering, past economic loss, future economic loss, back pay, front pay, wage increases, loss of life's pleasures, loss of reputation, benefits, emotional distress and other damages;

e.  Award reasonable costs and attorney's fees;

f.  Award punitive damages; and

g.  Grant any other relief this Court deems just and proper under the circumstances.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

**MARK B. FROST & ASSOCIATES**

 /s/ Ryan M. Lockman
Ryan Lockman
DATED: May 17, 2019          Counsel for Plaintiff

# EXHIBIT "A"

UNITED STATES DISTRICT COURT
**DISTRICT OF NEW JERSEY**

CHAMBERS OF
**ESTHER SALAS**
UNITED STATES DISTRICT JUDGE

MARTIN LUTHER KING
COURTHOUSE
50 WALNUT ST.
ROOM 5076
NEWARK, NJ 07101
973-297-4887

March 27, 2019

**LETTER ORDER**

Re:     ***Otero et al. v. Port Auth. of N.Y. & N.J. et al.*, Civil Action No. 14-1655**
***Mendez et al. v. Port Auth. of N.Y. & N.J. et al.*, Civil Action No. 14-7543**
***Turano et al. v. Port Auth. of N.Y. & N.J. et al.*, Civil Action No. 16-2578**
***Rizzo v. Port Auth. of N.Y. & N.J. et al.*, Civil Action No. 17-4386**

Dear Counsel:

Before the Court are multiple lawsuits filed by police officers against the Port Authority of New York and New Jersey (the "Port Authority") and many of its managerial personnel for, *inter alia*, alleged violations of the police officers' federal and state constitutional rights. (*See Otero v. Port Auth. of N.Y. & N.J.*, No. 14-1655; *Mendez v. Port Auth. of N.Y. & N.J.*, No. 14-7543; *Turano v. Port Auth. of N.Y. & N.J.*, No. 16-2578; *Rizzo v. Port Auth. of N.Y. & N.J.*, No. 17-4386). The cases involve 61 plaintiffs, and their allegations against the defendants span over 360 pages. (*See Otero*, D.E. No. 111; *Mendez*, D.E. No. 44; *Turano*, D.E. No. 24; *Rizzo*, D.E. No. 32). The facts underlying most claims, however, pertain to common events surrounding the Port Authority's 2011 and 2015 selection of police officers to be promoted to the positions of Sergeant and Lieutenant. (*See Otero*, D.E. No. 111; *Mendez*, D.E. No. 44; *Turano*, D.E. No. 24; *Rizzo*, D.E. No. 32).

On April 27, 2017, the *Mendez* and *Turano* plaintiffs filed amended complaints. (*Mendez*, D.E. No. 44; *Turano*, D.E. No. 24). The amended complaints contained similar factual allegations against the Port Authority and its managerial personnel. (*Compare, e.g.*, *Mendez*, D.E. No. 44 ¶¶ 4-5, 63, 165-88 & 219-22, *with Turano*, D.E. No. 24 ¶¶ 44-45, 58-59, 352-70 & 421-25). On February 7, 2018, the Court denied motions to dismiss those amended complaints, holding that the plaintiffs had cured the deficiencies previously identified by the Court regarding their political patronage discrimination claims and common-law fraud claim. (*See Mendez*, D.E. No. 55 at 6 & 9; *Turano*, D.E. No. 35 at 6 & 8).

On May 2, 2017, the *Otero* plaintiffs sought leave to file an amended complaint. (*Otero*, D.E. No. 145). The proposed amended complaint contained similar factual allegations to those in *Mendez* and *Turano*. (*See, e.g.*, *Otero*, D.E. No. 145-5, Ex. A ¶¶ 119-44, 150-52, 2348 &

1

2426-28). On December 18, 2017, Magistrate Judge Joseph A. Dickson denied-in-part the *Otero* plaintiffs' motion for leave to amend, holding that their political patronage discrimination claims and common-law fraud claims were futile. (*Otero*, D.E. No. 150 at 10-11 & 15-16). The plaintiffs appealed, and the Court affirmed the Magistrate Judge's decision on December 12, 2018. (*Otero*, D.E. Nos. 152 & 158).

On September 29, 2017, the *Rizzo* plaintiff filed an amended complaint. (*Rizzo*, D.E. No. 11). The amended complaint contained similar factual allegations to those in *Mendez*, *Turano*, and *Otero*. (*See, e.g.*, *Rizzo*, D.E. No. 11 ¶¶ 37-38, 90, 123-38 & 192-97). After oral argument on July 10, 2018, the Court granted a motion to dismiss the amended complaint. (*Rizzo*, D.E. No. 29).

It has come to the Court's attention that the Court's most recent decisions in *Otero*, *Mendez*, *Turano*, and *Rizzo* may be inconsistent with one another considering the complaints' substantially similar factual allegations. (*See Otero*, D.E. Nos. 145-5, Ex. A, & 158; *Mendez*, D.E. Nos. 44 & 55; *Turano*, D.E. Nos. 24 & 35; *Rizzo*, D.E. Nos. 11 & 29). To address the potential inconsistency, and to ensure that the Court has not overlooked any relevant factual distinctions among the plaintiffs, any key law, or any point raised by the parties, the Court will revisit these prior decisions. *See DeFranco v. Wolfe*, 387 F. App'x 147, 156 (3d Cir. 2010) (holding that before a final judgment a court may reconsider a prior decision if the court explains its reasoning on the record and takes appropriate steps to prevent prejudice).

Although the parties have engaged in discovery and have briefed a motion to dismiss in *Rizzo*, the Court finds that the reconsideration of its prior rulings will not prejudice the parties. This reconsideration takes place at the motion-to-dismiss stage, and as described below, the parties will have another chance to argue their positions with the Court's previous reasoning at their disposal. *See Washington-El v. Diguglielmo*, 419 F. App'x 275, 276-78 (3d Cir. 2011) (holding that the plaintiff was not prejudiced when the district court granted summary judgment on a second motion by the defendants, as the plaintiff had an opportunity to oppose the second motion and had not relied on the court's denial of the defendants' first summary judgment motion); *DeFranco*, 387 F. App'x at 156-57 (holding that the district court did not abuse its discretion in reconsidering, before trial, its previous denial of summary judgment and granting summary judgment against the plaintiff on his First Amendment retaliation claim, because the plaintiff was not denied the opportunity to present evidence on his claim and did not rely on the previous ruling); *Williams v. Runyon*, 130 F.3d 568, 571-73 (3d Cir. 1997) (holding that the district court erred in reconsidering, after trial, its denial on a motion to dismiss because the plaintiff relied on the previous ruling by not presenting appropriate evidence to the jury on the previously adjudicated matter).

To effectuate these reconsiderations, the Court will first consolidate these four cases under *Otero*, No. 14-1655, pursuant to Federal Rule of Civil Procedure 42(a)(2). *See In re J.C.*, 731 F. App'x 129, 132 (3d Cir. 2018) (explaining that district courts have broad discretion under Rule 42(a)(2) to consolidate cases involving common questions of law or fact); *Devlin v. Transp. Commc'ns Int'l Union*, 175 F.3d 121, 130 (2d Cir. 1999) (interpreting Rule 42(a) as empowering district courts to consolidate related cases *sua sponte*); *cf. Miller v. U.S. Postal Serv.*, 729 F.2d

2

1033, 1036 (5th Cir. 1984) (holding that "[t]he proper solution to the problems created by the existence of two or more cases involving the same parties and issues, simultaneously pending in the same court would be to consolidate them under Rule 42(a)" (citation omitted)).  The plaintiffs will file a universal and comprehensive complaint that sets forth their allegations against the Port Authority and other defendants.  The defendants will respond.  Then the Court will adjudicate the consolidated matter appropriately.

Plaintiff Sharon Otero's claim under the Americans with Disabilities Act (ADA) (*see Otero*, D.E. No. 111 ¶¶ 2432-37), which was not challenged through a motion to dismiss, will be severed under Federal Rule of Civil Procedure 21 to promote the expeditious resolution of that claim and to prevent any prejudice to her.  *See Eisai Inc. v. Sanofi-Aventis U.S., LLC*, No. 08-4168, 2012 WL 32202, at *9 (D.N.J. Jan. 5, 2012) (explaining that "[a]lthough Rule 21 is most commonly used to solve joinder problems, the rule may be invoked to prevent prejudice or promote judicial economy" (citation omitted)); *Turner Constr. Co., Inc. v. Brian Trematore Plumbing & Heating, Inc.*, No. 07-0666, 2009 WL 3233533, at *3 (D.N.J. Oct. 5, 2009) (same); *Lopez v. City of Irvington*, No. 05-5323, 2008 WL 565776 at *2 (D.N.J. Feb. 28, 2008) (same).

For these reasons,

IT IS on this 27th day of March 2019,

**ORDERED** that Civil Case Nos. 14-1655, 14-7543, 16-2578, and 17-4386 are CONSOLIDATED into a single matter under No. 14-1655; and it is further

**ORDERED** that all future filings pertaining to these cases will be made only in No. 14-1655; and it is further

**ORDERED** that Sharon Otero's ADA claim is SEVERED from No. 14-1655 under Federal Rule of Civil Procedure 21, and may proceed as a new separate action under a separate civil action number; and it is further

**ORDERED** that in a new action, Sharon Otero may file a complaint asserting her ADA claim, along with a copy of this Letter Order, **within 45 days of this Letter Order**; and it is further

**ORDERED** that the Clerk of Court waive the filing fee for Sharon Otero's new action; and it is further

**ORDERED** that the plaintiffs in Civil Case Nos. 14-1655, 14-7543, 16-2578, and 17-4386 will file a universal and comprehensive complaint in No. 14-1655 **within 45 days of this Letter Order**; and it is further

**ORDERED** that the *Rizzo* defendants' motion to dismiss (D.E. No. 36) is DENIED as moot; and it is further

3

**ORDERED** that the Clerk of Court TERMINATE docket entry number 36 in Civil Case No. 17-4386.


_s/Esther Salas_____
**Esther Salas, U.S.D.J.**